(C. D. 232)

JOHN J. COATES *v.* UNITED STATES

United States Customs Court, First Division

(Decided October 14, 1939)

*Puckhafer, Rode & Rode* (*John D. Rode* of counsel) for the plaintiff.
*Webster J. Oliver*, Assistant Attorney General (*Richard F. Weeks*, special attorney), for the defendant.

Before Evans, Brown, and McClelland, Judges

McClelland, Presiding Judge: This protest is directed against the action of the collector of customs at the port of New York in refusing to allow drawback on certain women's dresses imported into the United States during the years 1926 to 1928. The Commissioner of Customs, in a letter addressed to the collector of customs at the port of New York instructing him to disallow the drawback claimed, said, among other things:

In the case of M. M. MacCarthy, Inc. v. United States (T. D. 48571) the United States Customs Court held that imported "finished" dresses which were dyed in the United States were not "articles manufactured or produced in the United States with the use of imported merchandise," within the meaning of section 313 (a) of the Tariff Act of 1930. This decision is considered by the Bureau to be controlling in the case of the redyed dresses which were exported by Mrs. Lewis. In the circumstances, you should proceed to liquidate drawback entry No. 1473 "no drawback."

No question is raised as to compliance with the rules and regulations of the Secretary of the Treasury preliminary to the filing of claim for drawback allowance, so that therefore the only issue to be determined is whether or not the collector was justified under the provisions of the statute in disallowing the drawback claimed.

The protest contains the following paragraph:

It is claimed that the merchandise specifically enumerated in said drawback entry No. 1473 consisted of certain wearing apparel imported in the entries and in the amounts specifically referred to in said drawback entry No. 1473, which had been manufactured by the application of a dyeing process.

Even if it be conceded that the dyeing process to which the dresses in question were subjected was by itself a process of manufacture, by no reasonable stretch could it be said that such dresses after being dyed were, merely because of such dyeing, dresses "manufactured or produced in the United States *with the use of imported merchandise*" [Italics added]. It cannot be gainsaid that the dyed dresses were any other than the completely manufactured and finished dresses imported into the United States. Neither can it be said that the dresses when dyed were any other in form, shape, or material than they were when they were imported into the United States. They were completely manufactured and finished dresses when they entered the commerce of the United States, and as to these particulars they were identically the same when they were exported for benefit of drawback. It is a matter of common knowledge that it is not at all unusual for women after wearing dresses to send them to dyers with the sole purpose of having the color changed, and manifestly the dresses in question were sent to the dyer solely for that purpose, and it is not pretended that in thus having the color changed there resulted any change in the form, character, or use of the dresses.

In deciding the case of *Rolland Frerés, Inc.,* v. *United States,* T. D. 47302, which involved the question of whether women's dresses imported into the United States and subsequently embroidered and exported were entitled to drawback, we said:

There does not appear to be any serious dispute about the material facts in the case. The witnesses are agreed that the articles imported were "finished" dresses, imported into the port of New York and later sent to an embroidering establishment and there embroidered, each according to a separate design, upon the sleeves, neck, or upper front in color to harmonize with the color of the dress material. After being so embroidered the dresses covered by the protest were exported. Therefore the vital question involved is whether these dresses by reason of having been so embroidered were "articles manufactured or produced in the United States with the use of imported merchandise."

\*     \*     \*     \*     \*     \*     \*

To come within the meaning of the language of section 313, *supra*, to entitle articles exported to the benefit of drawback it must be definitely established that they were manufactured or produced in the United States with the use of imported merchandise. As to the dresses in question we are convinced that no justifiable stretch of the meaning to be given on the terms "manufactured or produced \* \* \* with the use of imported merchandise" could be held to apply to these dresses, of which the most that may be said is that they were dresses as they entered the United States which after being embellished by embroidery were exported, still in the form of dresses, just as they entered the United States.

Doubtless the processes of embroidering these dresses might with justification be termed manufacturing processes, but that fact does not overcome the more important fact that the articles were finished dresses, as conceded by the witnesses, as they entered the commerce of the United States, and were still in the form and shape in which they entered the United States when they were exported.

From our decision in that case an appeal was taken to the Court of Customs and Patent Appeals and it was there affirmed (23 C. C. P. A. 81, T. D. 47763).

In a later case, *Howard Hardy & Co., Inc.* v. *United States,* T. D. 48441, there was presented to this court the question of whether certain woolens, which after importation had been subjected to a process called "imperial finishing," were on exportation entitled to drawback. Following the *Rolland Frerés* case, *supra*, we denied the claim and overruled the protest. We quote the following from our opinion:

We find that the woolens in question were not manufactured or produced in the United States with the use of imported merchandise, but were simply imported woolens that had been subjected to additional processes without altering their name or character. This view is amply sustained in the celebrated case of *Ishimitsu* v. *United States*, 11 Ct. Cust. Appls. 186, T. D. 38963, wherein it was said among other things, referring to the case of *Hartranft* v. *Wiegmann*, 121 U. S. 609:

It was also in substance and by way of illustration said that washing and scouring wool or cleaning and ginning cotton did not result in a manufacture of wool in the one case and of cotton in the other.

From that decision an appeal was taken to the Court of Customs and Patent Appeals and it was there affirmed (25 C. C. P. A. 16, T. D.

48978). A careful reading of the opinion of Bland, Judge, whose conclusion was unanimously concurred in by all of his associates, would seem to bar any other conclusion in this case than that the dresses in question had not been so transformed as entitled the exporter thereof to the benefit of drawback.

Counsel for the protestant have cited in their brief 224 references to synopses of drawback rates issued by the Treasury Department fixing rates of drawback on numerous kinds of textile materials which were to be dyed and exported for benefit of drawback. It is noted that none of the attending facts which resulted in the fixing of these rates of drawback are furnished, nor does it appear at all in any of the instances enumerated that drawback was either allowed or disallowed finally.

We do not overlook the case of *Joshua Hoyle & Sons, Ltd., Inc.* v. *United States*, 25 C. C. P. A. 128, T. D. 49244, in which it was held that cloth which after importation had been bleached and mercerized was entitled to drawback under the provisions of section 313 of the Tariff Act of 1930. It is noted that in the opinion of Hatfield, Judge, concurred in by his associates, that the cases of *Rolland Freres* and *Howard Hardy & Co.*, on which we rely as controlling, are cited, but are not expressly disapproved or overruled. We quote from the opinion the following, from which it would appear that the conclusion of the court that the exported merchandise was entitled to the benefit of drawback was based on a long-continued administrative practice in the Treasury Department of allowing drawback on cotton cloth which after importation was bleached and mercerized and subsequently exported:

Whether the involved merchandise comes within the principles announced in those decisions in the *Rolland Freres* and *Howard Hardy & Co.* cases, is a question not free from difficulty. However, it appears, as argued by counsel for appellant and not denied by counsel for appellee, that it has been the long-continued administrative practice to allow a refund of duties, as drawback, on cotton cloth imported in the "gray" state and subsequently bleached and mercerized, and, as so processed, exported to a foreign country.

On March 3, 1915, T. D. 35184, 28 Treas. Dec. 326, December 10, 1915, T. D. 35965, 29 Treas. Dec. 647, and January 12, 1916, T. D. 36060, 30 Treas. Dec. 51, the Treasury Department held that cotton goods, which had been bleached and mercerized, were manufactured or produced within the purview of paragraph 0 of section 4 of the Tariff Act of 1913, and drawback was allowed on such goods.

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

Such administrative practice continued under the provisions of section 313 *supra*, and also under the provisions of section 313 (a) of the Tariff Act of 1930. See T. D. 44907, dated May 22, 1931, 59 Treas. Dec. 1216, 1217; T. D. 45088 (T) dated August 1, 1931, 60 Treas. Dec. 296, 297.

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

The Congress having reenacted the quoted provisions of paragraph 0 of section 4, *supra*, without material change, so far as the issues here are concerned, as section 313 of the Tariff Act of 1922, we think the doctrine of legislative approval of long-continued administrative practice is applicable to, and deter-

minative of, the issues here presented and that appellant is entitled to a refund of duties as drawback, as provided in section 313, *supra*.

To those familiar with that part of customs practice relating to drawback it is commonly and well known that a so-called rate at which drawback will be allowed is fixed in most instances a long time previous to the entry of goods which are to be subjected to manufacturing processes in the United States and subsequently exported for benefit of drawback, and it is equally well known that the mere fixing of a rate does not bar either the Secretary of the Treasury or the collector of customs from ultimately refusing to allow drawback. It is not revealed whether in any of the instances cited by the plaintiff wherein rates of drawback were established such drawback was ultimately allowed or disallowed. There is nothing before us, therefore, upon which long-continued administrative practice could be based, even if it were held controlling in the case at bar.

Further, it is noted that in the instant case drawback is claimed by reason of the provisions of T. D. 35965, which establishes the conditions upon which drawback will be granted on "bleached, mercerized, dyed, bleached and mercerized, bleached, and dyed, mercerized and dyed, or bleached, mercerized, and dyed *cotton piece goods manufactured from cotton piece goods imported in the gray or in an unfinished state*" [Italics added]. None of the merchandise at bar falls within that category.

The protest is therefore overruled and the decision of the collector is affirmed. Judgment will issue accordingly.